[This opinion has been published in *Ohio Official Reports* at 74 Ohio St.3d 647.]

ELSAG-BAILEY, INC., D.B.A. BAILEY CONTROLS COMPANY, APPELLEE, *v.* LAKE COUNTY BOARD OF REVISION ET AL; WICKLIFFE CITY SCHOOL DISTRICT BOARD OF EDUCATION, APPELLANT.

[Cite as *Elsag-Bailey, Inc. v. Lake Cty. Bd. of Revision*, 1996-Ohio-308.]

*Taxation—Real property valuation—Determination of fair market value by Board of Tax Appeals when board unable to agree with conclusions of appraisers.*

(No. 95-537—Submitted November 30, 1995—Decided March 1, 1996.)

APPEAL from the Board of Tax Appeals, Nos. 93-M-828, 93-M-829, 93-M-830 and 93-M-831.

———————————

{¶ 1} On March 26, 1993, Elsag-Bailey, Inc., d.b.a. Bailey Controls Co. ("Elsag-Bailey"), filed a complaint with the Lake County Board of Revision ("BOR") contending that three parcels of real estate (Nos. 29A-3-5, 29A-3A-16, and 29A-3A-36) owned by it were overassessed for tax year 1992. The three parcels constitute 41.89 acres of a 43.726-acre tract owned by Elsag-Bailey on the north side of Euclid Avenue at Bailey Drive (formerly Worden Road) in Wickliffe, Ohio. The three parcels had been valued by the Lake County Auditor at a true value of $13,662,300; Elsag-Bailey contended before the BTA that the three parcels had a true value of $3,000,000.

{¶ 2} The Wickliffe City School District Board of Education ("BOE") filed a counter-complaint, stating the true value of the property should be $13,662,300.

{¶ 3} On October 31, 1989, title to the three parcels, along with that of a vacant fourth parcel of minor value, was transferred, and a conveyance fee statement was filed with the Lake County Auditor, which set forth a purchase price of $13,700,000. The 1989 transfer was part of a worldwide buyout of numerous properties for a lump sum. Elsag-Bailey hired Arthur Andersen & Company to

allocate the lump-sum purchase price; the Wickliffe, Ohio real property was allocated a purchase value of $13,700,000.

**{¶ 4}** There are two primary buildings located on the Elsag-Bailey property. The smaller of the buildings is a brick office building built in 1963 that contains 257,425 square feet of space. The office building consists of a front and a rear part connected by a service corridor. Because the office building is built into a hillside, only two floors of the three-floor front part can be seen from Euclid Avenue. All four floors of the back part of the building are visible from the rear. The office building houses executive, engineering, sales, and various other administrative offices.

**{¶ 5}** An enclosed walkway connects the office building with a separate manufacturing-office building, part of which is one-story high, with the remainder being three stories. The three-story portion of the manufacturing-office building contains offices and an assembly area, the one-story portion of the building is used for manufacturing. The manufacturing-office facility, which contains 270,977 square feet, was constructed in several sections between 1955 and 1978. The total area of all facilities on the property is 545,403 square feet.

**{¶ 6}** Heat for both buildings is provided by high-pressure boilers located in the manufacturing-office building. The air conditioning system for the office building is also located in the manufacturing-office building; however, there is essentially no air conditioning provided to the one-story manufacturing facility. The utilities are transmitted to the office building through ducts located in the tunnel connecting the buildings.

**{¶ 7}** The BOR determined the true value of the property to be $13,662,300. Elsag-Bailey appealed this decision to the Board of Tax Appeals ("BTA").

**{¶ 8}** At the BTA, appraiser Lawrence A. Kell testified on behalf of Elsag-Bailey. He stated that, while he considered the standard three approaches to valuation, only the sales-comparison or market approach fit this property. Kell

rejected the cost approach because he considered that, under the cost approach, the buildings would be assumed to be rebuilt as they are currently, and he said he would not do that. The income approach was rejected by Kell because of the difficulty in subdividing the property. Kell therefore used the sales-comparison approach to value the property. Kell chose nine building sales and two listings, one of which sold subsequent to his written appraisal, as comparables. Kell reviewed his nine comparables and two listings, which ranged in size from over 1,700,000 square feet to just over 225,000 square feet. He compared the comparables to the Elsag-Bailey property, made adjustments, came to the conclusion that the property should be valued in the range of $2,700,000 to $3,200,000, and finally determined a fair market value of $3,000,000.

{¶ 9} Appraiser Richard P. Van Curen, testifying on behalf of the BOE, also chose not to value the property by the cost approach. Van Curen considered comparable lease rates as the basis for his income-capitalization approach. Based on his estimated rental income, deductions for various expenses, and a capitalization rate of twelve percent, he calculated a fair market value of $8,600,000. In addition, Van Curen prepared two different sales-comparison approaches to estimate the value of the property. First, he compared sales of office buildings similar to Elsag-Bailey's office building; in addition, he compared sales of manufacturing-office buildings similar to Elsag-Bailey's manufacturing-office building. Based on the assumption the two Elsag-Bailey buildings could be sold separately, he estimated a fair market value of $3,525,000 for the manufacturing-office building, and $5,790,000 for the office building, for a total of $9,315,000.

{¶ 10} For his second sales comparison approach Van Curen valued the Elsag-Bailey property as though it would be sold as one entity. Using this assumption, he estimated a fair market value of $9,250,000. Van Curen stated that he believed the sales approach should be the primary approach for the valuation of this property, and his final estimate of fair market value was $9,250,000.

**{¶ 11}** After hearing the testimony, the BTA determined the true value of the Elsag-Bailey property to be $5,811,550.

**{¶ 12}** This matter is before this court upon an appeal as of right.

_____

*Wayne E. Petkovic*, for appellant.

*Baker & Hostetler, Lawrence V. Lindbergh* and *George H. Boerger*; and *George W. Hawk, Jr.*, for appellee.

_____

***Per Curiam.***

**{¶ 13}** The BOE contends that the $13,700,000 allocated price set forth in the October 31, 1989 conveyance fee statement established the best evidence of value. However, there is no evidence in the record to explain how the allocated price set forth on the conveyance fee statement was derived. When the BOE's own appraiser was asked about the more than four-million-dollar difference in values between his appraisal and the allocated value, he referred to his appraisal, in which he stated, "[c]ertainly the market did not change that much in 26 months, but we believe that the [allocated] sale price included 'value in use' aspects that our value indication does not." Likewise Elsag-Bailey's appraiser stated in his appraisal, "[t]he allocation was done without, to the best of our knowledge, the input of a qualified real estate appraisal."

**{¶ 14}** In a prior case involving an allocated purchase price, *Consol. Aluminum Corp. v. Monroe Cty. Bd. of Revision* (1981), 66 Ohio St.2d 410, 20 O.O.3d 357, 423 N.E.2d 75, we stated, "[t]he Board of Tax Appeals is not required in every instance, and in all events, to accept as the true value in money of real property, an allocation of a portion of a lump sum purchase price paid for a group of assets ***." *Id.* at 414-415, 20 O.O.3d at 360, 423 N.E.2d at 78. We further stated in *Consolidated Aluminum Corp.*, in referring to a prior opinion in the same case, "[t]his court did not instruct that the board must use the value as allocated by

the appellant. The court, in its opinion, stated that the board must receive all competent evidence in order to determine the true value of the property." *Id*. at 414, 20 O.O.3d at 359, 423 N.E.2d at 78. In this case the BTA considered all the evidence, and based upon its evaluation of that evidence the BTA determined the true value of the property.

{¶ 15} The BOE further contends that if the BTA rejected the appraisal offered by the taxpayer, it had to accept the value set by the BOR. The BOE ignores the fact that two different appraisals of the fair market value of the property were presented to the BTA. The opinions of the taxpayer's appraiser and the BOE's appraiser were widely divergent. The BTA evaluated the strengths and weaknesses of the two appraisals and determined its own value. In *Cardinal Fed. S. & L. Assn. v. Cuyahoga Cty. Bd. of Revision* (1975), 44 Ohio St.2d 13, 73 O.O.2d 83, 336 N.E.2d 433, we held in paragraph two of the syllabus that "[t]he Board of Tax Appeals is not required to adopt the valuation fixed by any expert or witness." In paragraph four of the syllabus, we further held that "[t]he fair market value of property for tax purposes is a question of fact, a determination of which is primarily within the province of the taxing authorities, and this court will not disturb a decision of the Board of Tax Appeals with respect to such valuation unless it firmly appears from the record that such decision is unreasonable or unlawful."

{¶ 16} In this case, the BTA first analyzed the points upon which the two appraisers agreed. Both appraisers agreed on the highest and best use of the property, and both agreed the cost approach was not proper in this case. Only the BOE's appraiser considered the income approach to value; however, having considered it he stated he believed the sales-comparison approach should be the primary approach to value. Thus both appraisers believed that the sales-comparison approach was the best appraisal method of estimating value.

{¶ 17} After reviewing the work of both appraisers, the BTA found it was unable to agree with the conclusions of either appraiser. The BTA rejected the

income-capitalization approach. The BTA found the sales-comparison approach to valuation to be the most accurate approach for determining the value of this property. The BTA then reviewed the sales comparables of both appraisers, and found certain comparables upon which it believed it could place some weight. Based on these comparables the BTA arrived at its valuation.

{¶ 18} The BOE contends that the BTA's determination of value was a "quotient verdict," in that the fair market value determined by the BTA was approximately 47.5 percent of the sum of the appraisals. The BOE cites no evidence to substantiate its claim that the BTA arrived at a quotient verdict. We reject the BOE's contention. Any time the BTA is presented with a range of values and determines a value within that range, it could be accused of arriving at a quotient verdict. In this case, the BTA adequately explained its reasons for determining fair market value.

{¶ 19} We conclude that there was sufficient evidence to support the BTA's determination of fair market value. The decision of the BTA was reasonable and lawful, and, accordingly, it is hereby affirmed.

*Decision affirmed.*

MOYER, C.J., DOUGLAS, WRIGHT, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

————————————